**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WEATHERFORD SWITZERLAND TRADING
AND DEVELOPMENT GMBH, solely in its
capacity as Administrative Agent of a certain
indenture dated as of June 28, 2016, and
WEATHERFORD LATIN AMERICA, S.C.A.,

Case No.: 1:23-CV-10703-LJL

          Plaintiffs,

ORAL ARGUMENT
REQUESTED

    -against-

PETRÓLEOS DE VENEZUELA S.A. and PDVSA
PETRÓLEO, S.A.,

          Defendants.

**DECLARATION OF HORACIO MEDINA IN SUPPORT OF**
**DEFENDANTS' OPPOSITION TO SUMMARY JUDGMENT**

I, HORACIO MEDINA, hereby declare pursuant to 28 U.S.C. § 1746 and Local Rule 7.1

as follows:

1.      I am President of the Ad-Hoc Board of Petróleos de Venezuela, S.A. ("PDVSA"),

and I submit this declaration pursuant to Fed. R. Civ. P. 56(d) and in support of defendants

PDVSA and PDVSA Petróleo, S.A.'s ("Petróleo" and together with PDVSA, the "Defendants")

opposition to plaintiffs Weatherford Switzerland Trading and Development GMBH

("Weatherford GmbH") and Weatherford Latin America, S.C.A.'s ("Weatherford Lain America"

and together with Weatherford GmbH, the "Plaintiffs") motion for summary judgment (Dkt. 1-2)

(the "Motion").

2.      Unless otherwise indicated, the facts set forth herein are based upon my personal

knowledge or upon information obtained by me from Defendants, their representatives, and

contained in their books and records kept in the ordinary course of their businesses, to which books and records I have access.

3.      PDVSA is the wholly state-owned oil company of the Bolivarian Republic of Venezuela ("Venezuela"), which manages and oversees all of Venezuela's oil and gas operations.  Petróleo is a wholly-owned subsidiary of PDVSA.

**The Authoritarian Maduro Regime**

4.      In 2013, following the death of Hugo Chávez, Nicolás Maduro took power as president of Venezuela.  Venezuela's political, humanitarian, and economic situation has only declined under Maduro.

5.      The United States Department of State has observed that the authoritarian dictator has engaged in election manipulation, suppression of dissent, and violent and systematic repression of human rights and fundamental freedoms, including the use of torture, arbitrary detentions, and extrajudicial killings.  *Venezuela 2022 Human Rights Report*, U.S. Dep't of State, at 1-9, 17-18, 33-37 (Mar. 20, 2023).

6.      Throughout his dictatorship, Maudro has taken actions to undermine and destroy democracy in Venezuela.  He has removed all impartiality from Venezuela's judiciary (including Venezuela's highest court, the Supreme Tribunal), and has illegitimately gained control of Venezuela's legislature (the National Assembly).  It is widely accepted that Maduro has rigged elections to remain in power within Venezuela and has arrested, tortured, and killed those who speak out against him.

**United States' Sanctions Regime Targeting Maduro, Venezuela, and Defendants**

7.      Two years after Maduro took power, on March 8, 2015, President Obama issued Executive Order 13692 ("EO 13692"), which declared a national emergency in response to "the Government of Venezuela's erosion of human rights guarantees, persecution of political

opponents, curtailment of press freedoms, use of violence and human rights violations and

abuses in response to antigovernment protests, and arbitrary arrest and detention of

antigovernment protestors, as well as the exacerbating presence of significant public corruption."

8.      In March 2017, the Maduro-controlled Supreme Tribunal took actions to weaken

the National Assembly—the only branch of government controlled by the Venezuelan

opposition—and assigned all of the National Assembly's legislative functions to the Maduro-

controlled judiciary. *Venezuela 2017 Human Rights Report*, U.S. Dep't of State, at 1, 26 (Apr.

20, 2018) ("The executive branch, however, used its control over the Supreme Court (TSJ) to

weaken the National Assembly's constitutional role to legislate, ignore the separation of powers,

and enable the president to govern through a series of emergency decrees.").

9.      In response, the Trump Administration initiated a sanctions regime to put pressure

on the Maduro government.  On July 26, 2017, the Office of Foreign Assets Control ("OFAC"),

pursuant to EO 13692, sanctioned thirteen then-current and former senior Venezuelan officials,

including the then-current and former Vice Presidents of Finance for PDVSA.  Press Statement,

*Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela*,

U.S. Dep't of the Treasury (July 26, 2017).

10.     Then, on August 24, 2017, President Trump issued Executive Order 13808 ("EO

13808"), which prohibits transactions related to new debt and bonds issued by the Government

of Venezuela.  Exec. Order No. 13808, 82 Fed. Reg. 41155 (2017).  EO 13808 expressly

includes PDVSA in its definition of the "Government of Venezuela." *See id.* at § 3(d).  OFAC

contemporaneously issued General License 3, which permitted payments on specific notes,

assuming certain conditions were not triggered.

11.     On March 19, 2018, President Trump issued Executive Order 13827 ("EO 13827"), which prohibits all transactions related to or dealing with any digital currency on behalf of the Government of Venezuela.  Exec. Order No. 13827, 83 Fed. Reg. 12469 (2018).  EO 13827 expressly includes PDVSA in its definition of the "Government of Venezuela."  *See id.* at § 3(d).

12.     Following EO 13827, the United States' sanctions regime against Venezuela continued to grow (*see, e.g.,* Exec. Order No. 13835, 83 Fed. Reg. 24001 (2018); Exec. Order No. 13850, 83 Fed. Reg. 52243 (2018) (authorizing the Secretary of the Treasury to impose blocking sanctions on entire sectors of the Venezuelan economy); Exec. Order No. 13857, 84 Fed. Reg. 509 (2019); *see also* Press Statement, *Issuance of New Venezuela-Related Executive Order and General Licenses; Venezuela-Related Designations*, U.S. Dep't of the Treasury (Jan. 28, 2019) (Secretary of the Treasury subjecting "persons operating in Venezuela's oil sector" to blocking sanctions pursuant to Exec. Order No. 13850); Press Statement, *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.*, U.S. Dep't of the Treasury (Jan. 28, 2019) (Secretary of the Treasury specifically designating PDVSA for blocking sanctions as a "person[] operating in [Venezuela's] oil sector")), and the sanctions regime continues today.  *Venezuela-Related Sanctions*, Office of Foreign Assets Control, U.S. Dep't of the Treasury (last visited Jan. 17, 2024).

**The United States Recognizes the Opposition Government as the Only Legitimate Government of Venezuela**

13.     On January 23, 2019, the National Assembly invoked the Venezuelan Constitution to declare Maduro's presidency illegitimate, and named National Assembly President Juan Guaidó as the Interim President of Venezuela.  For ease, I refer to both Guaidó's

government and the subsequent government led by the National Assembly (*see infra*) as the

"Opposition Government."

14.     The same day, President Trump declared the Maduro regime "illegitimate" and

officially recognized "Guaidó[] as the Interim President of Venezuela" and the National

Assembly as the "only legitimate branch of government duly elected by the Venezuelan people."

Press Statement, *Statement from President Donald Trump Recognizing Venezuelan National*

*Assembly President Juan Guaidó as the Interim President of Venezuela*, U.S. Dep't of Archives

(Jan. 23, 2019).

15.     Guaidó subsequently appointed the PDVSA Ad-Hoc Board, which the National

Assembly ratified on February 13, 2019.

16.     On December 30, 2022, the National Assembly voted to remove Guaidó from his

position as Interim President and dissolved his government.  Following this, the National

Assembly appointed a commission to manage Venezuela's foreign assets, and reaffirmed that the

PDVSA Ad-Hoc Board is still responsible for the day-to-day management of Defendants.

17.     The United States government confirmed its support for the National Assembly,

and continues to recognize the National Assembly as the only legitimate democratically elected

body of Venezuela to this day.  Press Statement, *Venezuela's Interim Government and the 2015*

*National Assembly*, U.S. Dep't of State (Jan. 3, 2023); 22 U.S.C. § 9702.

**The Defendants Appearing Before This Court Are the Legitimate PDVSA and Petróleo,
But Maduro Continues to Operate and Maintain Control of Documents and Personnel in
Caracas Under the Illegitimate Versions of PDVSA and Petróleo**

18.     Though the United States recognizes the Opposition Government as the only

legitimate government of Venezuela, the Maduro regime continues to operate an illegitimate

parallel government out of Caracas.  The Maduro regime has appointed and directed the control

of its own illegitimate boards of directors for Defendants ("Maduro's PDVSA & Petróleo"),

which are neither recognized by the Opposition Government or the United States.  Defendants

have no insight into the illegitimate actions of Maduro's PDVSA & Petróleo, other than those

publically reported.

20.      This parallel system of corporate governance came to a head in June 2019, when

former members of the CITGO board—appointed by Maduro's PDVSA—sued to halt the

ascension of the new CITGO board—appointed by the PDVSA Ad-Hoc Board.  *See Jiménez v.*

*Palacios*, 250 A.3d 814, 819-26 (Del. Ch. 2019), *aff'd*, 237 A.3d 68 (Del. 2020).  The Delaware

Chancery Court conclusively resolved the lawsuit in favor of the PDVSA Ad-Hoc Board,

concluding the United States' recognition of the National Assembly as the only legitimate

government of Venezuela renders the PDVSA Ad-Hoc Board the only valid governing body of

PDVSA for purposes of litigating in U.S. courts.  *See Jiménez*, 250 A.3d at 820 ("[T]his decision

accepts as binding the U.S. President's recognition of the Guaidó government and assumes the

validity of the Guaidó government's appointments to the PDVSA board.").

20.      Consistent with the Delaware decision, in any and all litigations across the United

States brought by or against Defendants, the Ad-Hoc Board directs the actions of Defendants in

court.

21.      Despite the conclusive recognition of the legitimacy of the PDVSA Ad-Hoc

Board, Maduro's PDVSA & Petróleo continue to exercise de facto control over the Defendants'

assets, books and records, and personnel within Venezuelan territory.  Moreover, Maduro's

PDVSA & Petróleo continue to conduct business and enter into contractual relationships without

the consent of Defendants or the PDVSA Ad-Hoc Board.

22.      The Defendants have no way of obtaining their own books and records located in

Venezuela, or to obtain the cooperation of PDVSA's personnel in Venezuela.  The Maduro

regime has illegally usurped control of Defendants' facilities from Defendants.  Moreover, any

individual in Venezuela who would seek to aid Defendants in obtaining their books and records

or assisting Defendants by providing testimony face a legitimate fear that the Maduro regime

would imprison them—or worse—for assisting Defendants.

**The Alleged Agreements and Contracts in This Case**

23.     Plaintiffs' Motion alleges that (1) Plaintiffs and Defendants entered into a Note

Agreement, dated June 28, 2016, (2) as part of the Note Agreement, Petróleo issued a guarantee,

and (3) PDVSA issued a Note to Plaintiff Weatherford Latin America, dated June 28, 2016.  It

appears from the Motion that the Note Agreement and Note are private contracts between

Plaintiffs and Defendants, and were not publically registered or traded.

24.     Until Defendants were informed of this lawsuit, Defendants were unaware of the

existence of both the Note and the Note Agreement, including Petróleo's purported guarantee

contained within.  Neither the Note nor the Note Agreement are in the books and records of

Defendants to which Defendants have access.  No documents or communications concerning the

negotiations, execution, or performance of the Note or the Note Agreement are in Defendants'

possession.  No witnesses or other persons with knowledge of the Note and Note Agreement are

available to Defendants.

25.     The Note Agreement and the Note purportedly require payments be made in

United States dollars and to the office of the Administrative Agent (Weatherford GmbH) at its

office in Switzerland.

26.     According to the Note Agreement attached to the Motion, the Note Agreement

relates to a Novation Agreement, under which certain purported obligations to pay accounts

receivable were released and exchanged for the Note.  Defendants are unaware of the existence

of such Novation Agreement, and no such Novation Agreement is in the books and records of

7

Defendants to which Defendants have access.  No documents or communications concerning the

negotiations, execution, or performance of the Novation Agreement are in Defendants'

possession.  No witnesses or other persons with knowledge of the Novation Agreement are

available to Defendants.

27.     The Motion further alleges PDVSA made quarterly interest payments pursuant to

the Note Agreement in September and December 2016, and in March, June, September, and

December 2017, though the September and December 2017 payments were allegedly made late.

Defendants possess no documents or communications concerning these alleged successful

payments.  No witnesses or other persons with knowledge of the successful payments are

available to Defendants.  Furthermore, Defendants possess no documents or communications and

have no access to any persons with knowledge regarding why the September and December 2017

payments were purportedly made late.

28.     The Motion claims PDVSA missed the payment due on March 28, 2018, made no

further payments under the Note Agreement, and that Petróleo made no payments following

PDVSA's alleged default.  Defendants possess no documents or communications concerning

these alleged failures to make payments by Defendants.  No witnesses or other persons with

knowledge of the lack of payments are available to Defendants.

29.     Plaintiffs allege they "made various unsuccessful attempts to collect the

outstanding balance from Defendants," including issuing various notices, requests, and letters.

Until Defendants were informed of this lawsuit, Defendants were unaware of the existence of

any alleged notices, requests, or letters.  No notices, requests, or letters are in the books and

records of Defendants to which Defendants have access.  No documents or communications

concerning these alleged notices, requests, or letters are in Defendants' possession.  No witnesses

or other persons with knowledge of any such notices, requests, or letters are available to

Defendants.

**The Information Defendants Seek, How It Will Be Obtained, and How Defendants Expect the Information to Create a Genuine Issue of Material Fact**

30.     Defendants, in conjunction with their counsel, continue to evaluate Plaintiffs'

lawsuit and claims.  While Defendants reserve all rights, including asserting additional or fewer

defenses or asserting counterclaims, for the purposes of Fed. R. Civ. P. 56(d) Defendants initially

believe discovery is required relating to various defenses, facts, and Plaintiffs' underlying

claims.

31.     At this early stage of litigation and without the benefit of any documents or

information beyond the allegations made in the Motion, Defendants intend to seek discovery

concerning the formation of the Note Agreement, including the purported novation that acted as

consideration, the payments and attempted payments made on the Note, and any communications

with financial institutions and/or Plaintiffs regarding attempted payments by either Defendant.

32.     Defendants anticipate information concerning the formation of and consideration

for the Note Agreement can be obtained directly from Plaintiffs.  Defendants anticipate

information concerning payments, attempted payments, and any explanation for why attempted

payments were unsuccessful can be obtained from Plaintiffs and third party financial institutions.

The specific financial institutions will be identified from documents and correspondence

Defendants anticipate are in Plaintiffs' possession regarding prior successful payments and

attempted payments on the Notes.

33.     The accompanying memorandum of law in opposition to the Motion explains in

greater detail the legal reasons why the above information is relevant to Defendants' defenses

and how it can raise genuine issues of material fact.  Without waiving any of their rights,

Defendants currently anticipate the discovery will go to the defenses of failure of consideration, payment, impossibility, and Plaintiffs' own inability to accept payment from Defendants.

34.     Regarding impossibility and Plaintiffs' own inability to accept payment from Defendants, Defendants believe discovery will demonstrate that financial institutions were unwilling to process payments from PDVSA due to the financial institutions' internal policies following the promulgation of sanctions by the United States government.  Defendants are aware that many financial institutions began to refuse to process debt payments from PDVSA in or around late 2017 and early 2018—the exact time period Plaintiffs claim PDVSA made late payments and then missed payments.  These internal policies made performance impossible, as PDVSA—despite its desire to pay—was unable to transfer funds due to prohibitions instituted by third parties.  This made payments on both public and private debt impossible.  Moreover, Weatherford Latin America—the end recipient of any funds under the Note Agreement—is a Venezuelan entity.  Defendants anticipate discovery will show that even if a financial institution was willing to accept a payment from Defendants under the Note Agreement, those financial institutions would then refuse to process the payment because the end recipient was a Venezuelan entity—thereby raising additional internal sanctions compliance red flags.  Based upon discovery obtained in other litigation on different debt instruments, Defendants believe it is likely discovery will show Defendants wanted to perform under the Note Agreement, made efforts to perform under the Note Agreement, but performance was made impossible by the actions of third-party financial institutions who were concerned about the sanctions exposure associated with either Defendants' or Weatherford Latin America's participation in the transaction.

**Defendants' Efforts to Obtain Information To Date**

35.      Based upon the prior actions and statements of the Maduro regime, such as accusing members of the Opposition Government of being traitors to Venezuela (including, specifically, for their actions related to and exercise of control over the Defendants), and upon previous attempts by the Opposition Government and Defendants to obtain documents and information from Defendants' offices and personnel in Caracas, Defendants know any requests to the Maduro regime or Maduro's PDVSA & Petróleo in Caracas concerning this lawsuit would be futile.  As such, Defendants have not made any such futile attempts to obtain information from Caracas.

36.      Understanding that most necessary information is in the possession of Plaintiffs, as Plaintiffs should possess documents and communications concerning the Note, the Note Agreement, and any successful, late, and/or any attempted payments thereunder, Defendants, through their counsel, have issued an initial request for documents to Plaintiffs.  To date, Plaintiffs have not responded to that request.

37.      Defendants anticipate issuing additional discovery requests to Plaintiffs, along with requests to third-party financial institutions relevant to this lawsuit.  In prior litigation, following the issuance of an official letter of request from this Court, some financial institutions (including those at which Defendants held bank accounts) were willing to provide relevant documents, while other institutions fought the requests in court.  Defendants anticipate requesting the issuance of such letters of request, once Plaintiffs have provided documents allowing Defendants to identify which financial institutions are relevant to this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed this __28th day of January, 2024

Horacio Medina